**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

EVELYN CHO,

     Plaintiff,

    - v -

AMAZON WEB SERVICES, INC., and KEVIN
ANDERSON,

     Defendants.

Civil Action No.: 1:26-cv-04288

**COMPLAINT**

**JURY TRIAL DEMANDED**

EVELYN CHO ("Cho"), by and through her attorneys, against AMAZON WEB
SERVICES, INC. ("AWS"), and KEVIN ANDERSON ("Anderson") (collectively "Defendants"),
alleges upon knowledge as to herself and her own actions and upon information and belief as to
all other matters as follows:

<b><u>PRELIMINARY STATEMENT</u></b>

1.   Cho brings this action pursuant to the discrimination and retaliation provisions of
(i) The Family and Medical Leave Act of 1993, as amended, 29 U.S.C. § 2601, *et. seq.* ("FMLA");
(ii) the New York State Human Rights Law, New York State Executive Law, § 296 *et seq.*
("NYSHRL");  (iii) the New York City Human Rights Law, New York City Administrative Code
§ 8-107(1), *et seq.* ("NYCHRL"), and any other claims arising under applicable federal, state, and
local law and seeks damages to redress the injuries Cho suffered as a result of being discriminated
and retaliated against by Defendants on the basis of Cho's disability (Graves' disease,
hyperthyroidism and thyroid eye disease) and need for legally protected leave.

2.   At all times material, Cho was a hardworking and dedicated employee with no
record of discipline or performance deficiency, who consistently went above and beyond her role
and responsibilities and was entrusted with high-visibility, executive-level initiatives.

1

3.      After Cho disclosed her serious medical conditions and submitted a request for legally protected medical leave, Defendants discriminated against Cho on the basis of her disability and interfered with her rights under the FMLA.

4.      This included denying reasonable flexibility related to medical treatment; pressuring Cho to use PTO and accusing her of not being logged in after her leave request had been submitted; subjecting Cho to heightened monitoring and scrutiny during the leave-approval period; and disregarding explicit guidance from Amazon Disability Leave Services.

5.      Despite having been notified that Cho was seeking medical leave and treating the leave as a foregone conclusion, Anderson required Cho to perform substantive work in advance of the commencement of her medical leave, including demanding operational review inputs and directing Cho to prepare and transfer work responsibilities to another employee in anticipation of her absence.

6.      Anderson minimized Cho's medical distress, failed to engage in the interactive process or provide accommodation, escalated pressure during periods of active symptoms, and treated Cho's role as effectively eliminated while she was in the process of entering protected medical leave.

7.      Senior leadership and Human Resources were placed on notice of this conduct, yet failed to take corrective action, allowing the discriminatory and retaliatory treatment to continue and ultimately culminate in the elimination of Cho's role during her approved medical leave.

## JURISDICTION, VENUE, AND PROCEDURAL REQUIREMENTS

8.      The Court has original jurisdiction over Cho's federal claims pursuant to 28 U.S.C. §§ 1331, 1343.

9.      The Court has supplemental jurisdiction over Cho's state and city law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy.

10.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

11.     Cho intends to submit a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*. Upon receiving a Notice of Right to Sue from the EEOC, Cho will seek leave to amend her Complaint to add ADA claims against AWS.

12.     Within 10 days of the commencement of this action, Cho will serve a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel, pursuant to New York City Administrative Code § 8-502(c).

## PARTIES

13.     At all times material, Cho was and is a female and a resident of the State of New York.

14.     At all times material, Cho was and is a "person" and an "employee" of Defendant Amazon Web Services, Inc., and entitled to protection as defined by the FMLA, NYSHRL, and NYCHRL.

15.     At all times material, AWS was and is the cloud computing division of Amazon, headquartered at 410 Terry Avenue North, Seattle, Washington, 98109, USA.

16. At all times material, Cho worked for AWS at its New York City office located at JFK 37 Amazon, 237 Park Avenue, New York, NY 10017. Before June 2025, Cho worked at the former location of AWS at JFK 27, 12W 39th St, New York, NY 10018.

17. At all times material, Anderson was the Head of Sales Operations – Core Services within AWS SMGS (Sales, Marketing, and Global Services),  Worldwide Specialist Organization ("WWSO"), at AWS.

18. At all times material, AWS employed over 140,000 employees.

19. At all times material, Anderson had supervisory authority over Cho. Anderson exercised authority over Cho's work assignments and had the authority to influence, recommend, and effect decisions regarding Cho's terms and conditions of employment, including work expectations, evaluations, and separation. Anderson is named individually to the extent permitted by applicable law, including under the FMLA, NYSHRL, and NYCHRL, based on his direct participation in and control over the discriminatory and retaliatory conduct alleged herein.

20. At all times material, AWS was and is an "employer" under the FMLA, NYSHRL, and NYCHRL.

## FACTS

21. On August 15, 2022, Cho began working for Defendant AWS as a Senior Strategy and Operations Lead, AWS TFC Program, Technical Field Communities.

22. Cho was hired at the L6 level into a role requiring sustained cross-organizational leadership, executive reporting and global program ownership.

23. Cho's starting base salary was $200,000 per year with a sign-on bonus totaling $66,100 (paid in prorated installments) and 985 restricted stock units ("RSUs") vesting over four years.

24.     Cho's pay remained the same throughout her employment with AWS. Cho was actively employed and in good standing at the time AWS initiated actions that placed her termination immediately before the scheduled RSU vest.

25.     On or about February 15, 2026, and August 15, 2026, Cho was scheduled to vest upcoming RSUs totaling 393 shares worth approximately $91,541.49.

26.     As a Senior Strategy and Operations Lead, AWS TFC Program, Technical Field Communities, Cho's duties and responsibilities included but were not limited to leading and operationalizing a VP-sponsored global strategic initiative (the "TFC1 Shared Goal"), one of AWS CEO Mr. Matt Garman's direct strategic priorities for 2025; designing, leading, and executing a global cross-organizational framework spanning 10 AWS organizations across all geographic regions (NAMER, EMEA, APJ, GCR), impacting more than 18,000 technical employees and supporting ~$21.8B in Closed/Won opportunities as of FY 2024; building and owning the TFC Shared Goal Dashboard in Amazon QuickSight used daily by approximately 3,500 internal stakeholders; developing the core measurement model and KPIs used by senior leadership; preparing VP- and L8-level reporting including six-page narratives, QBR packets, global strategy updates, and monthly updates; leading complex small group workstreams; publishing community newsletters to 18,000+ members worldwide; performing comprehensive field research and program analysis including case studies and retrospectives; presenting findings to senior leadership; and driving global execution without formal authority while mentoring new employees, using internal AWS tools, analytics and reporting dashboards, and productivity tools.

27.     These responsibilities required sustained executive trust and continuity and could not be effectively evaluated by a short-tenured manager unfamiliar with the program.

28.    Initially, Cho worked under the supervision of Mr. John Bell ("Mr. Bell"), Senior Manager, Technical Field Communities, who was Cho's hiring manager and remained Cho's primary functional leader through Cho's last day of work. Cho quickly developed a global scope, working closely with senior (L8 and VP) stakeholders worldwide.

29.    While Cho's role and substantive responsibilities remained consistent and continued to expand, Cho was administratively transferred, as part of an organization-wide transformation, from Mr. Bell's WWSO (World Wide Specialist Organization) into AWS SMGS Ops Central, World Wide Sales Strategy & Ops.

30.    Between late 2024 and early 2025, Cho's direct manager changed multiple times, including reassignment from Mr. Bell to Mr. Oscar Delgadillo ("Mr. Delgadillo"), then to Ms. Hiliary Robertson ("Ms. Robertson"), and ultimately to Anderson.

31.    As a result, Cho was required to report to successive managers who had limited or no prior familiarity with her work, role, or stakeholders, despite Cho continuing to perform the same work in support of Mr. Bell's global initiatives.

32.    At all times material, Anderson was Cho's supervisor.

33.    At all times material, Cho was a high-performing and dedicated employee with no disciplinary history and no negative performance reviews, warnings, or written or verbal performance concerns during her employment.

34.    Cho consistently received strong performance feedback and internal recognition for her work. Throughout her tenure, Cho received more than ten "AWSome Awards"[1] and other internal accolades, including two awards from her hiring manager, Mr. Bell, in 2024 and an AWSome Award from her then-manager, Ms. Robertson, in March 2025.

---

[1] AWSome Awards are internal peer- and manager-nominated recognitions given to Defendant AWS's employees for exceptional performance, impact, and contributions aligned with Defendant AWS leadership principles

35.     Cho also received positive feedback and recognition from VP- and L8-level leaders for her leadership of the TFC1 Shared Goal and related strategic initiatives.

36.     Cho was explicitly supported by management for promotion to L7 and, with senior leadership backing, actively prepared her promotion materials for more than a year. The March 2025 AWSome Award and contemporaneous written praise—copied to Anderson's manager, Mr. Delgadillo—confirmed Cho's strong performance immediately preceding the change in supervision and the onset of the adverse actions described herein.

37.     In or around July 2024, Cho was diagnosed with Graves' disease and related thyroid conditions, including thyroid eye disease.

38.     These conditions can cause significant physical symptoms, including heart palpitations, shortness of breath, tremors, and heightened anxiety.

39.     Despite these diagnoses and symptoms, Cho continued to perform her duties at a high level.

40.     Cho's condition materially worsened only after Defendants' conduct—including destabilizing management changes, the reversal of promotion support, denial of medical flexibility, and Anderson's hostile treatment—exacerbated Cho's symptoms and substantially impaired her ability to function.

41.     In the summer of 2024, while Cho was still reporting within John Bell's organization, Cho engaged in discussions with Mr. Oscar Delgadillo regarding a potential transfer to his team, as he was expected to become her next manager following the organizational transition.

42.     During these discussions, Cho expressed a preference to remain in her then-current organization to complete her first promotion cycle for Q1 2025.

43.    Mr. Delgadillo nevertheless encouraged Cho to join his team and expressly committed to continued promotion support.

44.    Mr. Delgadillo informed Cho that, due to the absence of immediate L7 headcount, he had already placed her on the promotion roster for Q3 2025, and verbally reaffirmed that her work on the TFC program constituted viable L7-level scope and impact. This understanding was reiterated shortly after Cho joined his team.

45.    On October 25, 2024, consistent with the prior representations described above, Cho received written confirmation from Mr. Delgadillo that she was on track to raise an L7 promotion document for the Q3 2025 cycle, contingent on continued refinement of her promotion packet.

46.    The guidance focused on strengthening the narrative around sustained L7-level impact and scaling, and reaffirmed that Cho's work on the TFC program supported a viable promotion path.

47.    This written guidance was provided with full knowledge of Cho's then-current scope and responsibilities, which had not materially changed.

48.    From at least August 2024 through the November 6, 2024 offsite, Cho's managers—including Mr. Delgadillo and Ms. Robertson—reiterated, both verbally and in writing, that Cho remained on track for a Q3 2025 L7 promotion, subject only to continued refinement consistent with the feedback already provided.

49.    In reliance on this guidance, Cho proactively undertook concrete steps to further strengthen her promotion packet and expand her remit, including shadowing interviews and engaging in management training.

50.     Nevertheless, on November 7, 2024, the final day of the offsite, Mr. Delgadillo abruptly withdrew this support for the first time, asserting—without identifying any intervening change in Cho's role, responsibilities, or performance—that Cho's role was not operating at L7 scope.

51.     When Cho sought clarification, Mr. Delgadillo failed to articulate objective criteria, concrete examples, or actionable guidance, leaving the matter unresolved.

52.     This unexplained reversal stood in sharp contrast to the consistent and documented promotion guidance previously provided and was later echoed by Anderson as a basis to undermine Cho's promotion trajectory.

53.     Sometime before the offsite in November 2024, Cho was directly approached by an L8/VP-level senior leader within AWS, Mr. Geries AbouAyash ("Mr. AbouAyash"), regarding an internal role opportunity.

54.     Cho declined this opportunity not due to lack of interest or performance concerns, but because she was actively preparing for her L7 promotion cycle in her existing role and had received leadership encouragement to remain focused on that path.

55.     At the time of this outreach, Cho was viewed at the Vice President level as a high-performing senior leader with continued growth potential within the organization.

56.     Additionally, in late 2024, Cho received another internal role opportunity to work with Zehra Zaidi, Senior Manager, Field Tech Ops, AWS SMGS Ops Global, which Cho also declined in order to focus on her promotion path in her existing role.

57.     In late April 2025, Anderson became Cho's direct supervisor. He did not hire Cho, had limited familiarity with the TFC program, and did not meaningfully engage with the senior-level strategy or executive partnerships central to Cho's role.

9

58.    Notably, Anderson assumed supervisory authority over Cho approximately two months before Cho's medical leave and had not previously managed or evaluated her work.

59.    On or about May 19, 2025, during a 1:1 meeting with Anderson, Cho stated that she was unwell and explicitly said, "I can't really breathe right now."

60.    Rather than pausing or rescheduling the meeting, Anderson continued sustained performance criticism, told Cho that he did not want her to be "emotional," minimized her condition by stating that he was "also very sick," offered no accommodation or relief, and continued criticizing her work and discouraging her promotion trajectory, including suggesting that her role might never be perceived at the next level, while Cho was experiencing active medical symptoms.

61.    At no point did Anderson pause the meeting, inquire about Cho's medical condition, or offer any accommodation.

62.    In or around May 2025, Cho disclosed her underlying medical conditions, including Graves' disease and hyperthyroidism to Defendants.

63.    On or about June 13, 2025, Cho formally submitted a written request to Anderson, her direct supervisor, seeking approval to work remotely from Korea from July 7–18, 2025, for medical treatment, ahead of her planned vacation from July 19, 2025, to August 4, 2025.

64.    Cho explained that the request was tied to critical Asia Pacific & Japan ("APJ") leadership engagements and development of the 2026 TFC strategy. Cho provided detailed information regarding scheduled stakeholder meetings, leadership support, and work expectations.

65.    The request was made after consultation with, and with the express support of, Cho's key stakeholders and hiring manager, confirming continuity of leadership alignment and business need.

66.    The request also included time-sensitive engagement with senior APJ leadership in connection with a VP-sponsored global initiative, which Cho had been invited to support.

67.    On or about June 18, 2025, Cho's hiring manager and primary functional leader, Mr. Bell, reviewed Cho's L7 promotion document and provided positive feedback, confirming that her work continued to operate at L7 scope and supporting her advancement.

68.    Mr. Bell had supervised Cho's work closely for nearly three years and has been with AWS for over a decade, giving him deep familiarity with L7 scope, expectations, and promotion standards.

69.    This review occurred days before Anderson denied Cho's request for medical flexibility and weeks before her termination, demonstrating that Cho's performance and scope remained strong immediately prior to the adverse actions.

70.    On June 24, 2025, despite repeated follow-ups and clarification, Anderson denied the request to work remotely from Korea from July 7-18, 2025, stating that it fell outside standard remote work policy guidelines and instructing Cho to use PTO and/or a leave of absence instead.

71.    In person, Anderson asserted that the team would not approve the arrangement even if HR did, and challenged the necessity of specialized medical care by questioning why Cho could not receive treatment locally.

72.    As a result, Cho felt discouraged and restricted in pursuing needed medical care.

73.    Notably, along with her request to work remotely from Korea for medical treatment, Cho submitted a time-sensitive, fully scoped request to engage with L8 Director, AGS APJ Technology, Mr. Ben Cabanas ("Mr. Cabanas"), in connection with a VP-sponsored global initiative. Mr. Cabanas had expressed openness to Cho's participation in an upcoming APJ Technology leadership session as reflected in contemporaneous communications.

74. Cho sought Anderson's approval to proceed with the engagement and related work from Korea, including preparation with APJ leaders ahead of the session.

75. Anderson withheld the request for approximately eleven days and then denied it without explanation or substantive rationale, thereby blocking Cho's access to senior leadership and materially interfering with the advancement, visibility, and trajectory of her initiative and role.

76. The seriousness of this obstruction to meet Mr. Cabanas was underscored when Cho later described the incident in person to Senior Leader, Mr. Slavik Dimitrovich (L8) ("Mr. Dimitrovich"), Head of AI Specialist Solutions Architecture, who reacted with immediate shock and condemnation, indicating that the conduct fell outside professional norms and was inconsistent with typical handling of executive engagement requests.

77. In or around late June 2025, Anderson asserted to Cho that her role "may never be in scope" for L7, notwithstanding prior written promotion guidance and approvals from Cho's management chain based on the same role, scope, and responsibilities.

78. Anderson's assertion was not tied to any documented performance deficiency, organizational re-scoping, or intervening change in Cho's duties, and did not reflect a formal or communicated determination by the organization. This statement marked a sharp departure from the consistent promotion guidance Cho had received and created material uncertainty and distress by destabilizing Cho's role expectations without any factual or organizational basis.

79. In June 2025, following Anderson's response, Cho contacted Amazon Disability Leave Services ("DLS") and Human Resources, who advised Cho that managers may not interfere with FMLA, that employees are protected once a leave request is submitted, and that employees should not be pressured to work or to use PTO while leave is pending or after approval.

80. Thereafter, Cho formally requested FMLA/medical leave in late June 2025.

81.     As stated hereinabove, Cho had disclosed her underlying medical conditions, including Graves' disease and hyperthyroidism, in or around May 2025.

82.     After Anderson became aware that Cho was seeking protected medical leave through AWS Disability and Leave Services ("DLS"), Defendants' treatment of Cho changed materially.

83.     This shift began before the leave was formally approved and escalated thereafter, notwithstanding Cho's continued strong performance and efforts to remain productive while pursuing medical care.

84.     In late June 2025, after learning that Cho had submitted a request for FMLA/medical leave, but before the leave was formally approved, Anderson began hourly monitoring of Cho's online presence and repeatedly pressured her to use PTO, accusing her of not being logged in despite her continued work and medical distress.

85.     This monitoring began only after Anderson became aware of Cho's leave request.

86.     After Cho disclosed her disability and requested legally protected medical leave, Anderson engaged in a pattern of retaliatory conduct designed to manufacture failure and justify adverse action.

87.     This conduct by Anderson included assigning new and previously undisclosed assignments without prior discussion, imposing false urgency and unrealistic timelines, directing Cho to transfer her responsibilities while she remained employed, pressuring Cho to perform work while she was on approved and protected medical leave, subjecting Cho to excessive and near-hourly monitoring through email and Slack, and falsely accusing Cho of failing to attend meetings that she had never accepted.

13

88.    This escalation occurred after Anderson became aware of Cho's request for medical leave and while Cho was experiencing active medical symptoms, and despite written instructions from Amazon Disability Leave Services that Cho should not attend meetings, evidencing retaliatory animus and unlawful interference with Cho's protected rights.

89.    On June 30, 2025, Amazon DLS notified Anderson in writing that Cho's healthcare provider recommended she not attend meetings due to the risk of worsening her condition and that her medical leave request was under review.

90.    Despite this directive, Anderson intensified the hourly monitoring, escalated messages, and pressured Cho regarding work and attendance.

91.    Anderson continued sending emails and Slack messages to Cho stating, *inter alia,* that she failed to attend meetings she had not accepted, directing Cho to log in and perform work to transition her responsibilities to another employee, reprimanding Cho despite her medical distress.

92.    Cho contemporaneously forwarded these communications to DLS to document Anderson's conduct and seek assistance.

93.    On July 1, 2025, Cho's medical leave/FMLA was approved to commence on July 3, 2025, and was scheduled through August 5, 2025.

94.    Cho's medical leave/FMLA was subsequently extended twice based on medical necessity, ultimately through January 6, 2026.

95.    On July 2, 2025, the day before Cho's leave began, Cho emailed DLS, documenting Anderson's escalating pressure, monitoring, and accusations in the days leading up to her leave, attaching contemporaneous screenshots and emails.

96.     Cho did so to ensure DLS had a record of this conduct, particularly given that DLS had already advised in June that managers could not interfere with FMLA or pressure employees to work while a medical leave request was pending.

97.     On July 17, 2025, approximately two weeks into Cho's approved medical leave, Cho received a letter stating that her role had been eliminated and that she would receive a 90-day adjustment period beginning after her return from leave.

98.     Immediately following the July 17, 2025, role-elimination notice, Anderson canceled all scheduled 1:1 meetings with Cho without explanation, reflecting his understanding that Cho's role had been eliminated and his complete disengagement was appropriate while Cho remained on protected medical leave.

99.     The receipt of a role-elimination notice during leave significantly worsened Cho's medical condition, causing increased heart palpitations, anxiety, and other Graves-related symptoms, which multiple treating physicians later documented as being materially exacerbated by employment-related stress.

100.    As a result, Cho's medical leave and short-term disability were extended through January 6, 2026.

101.    This sequence of events shows a direct link between Defendants' actions during Cho's protected leave and both employment-related harm and the worsening of her medical condition.

102.    Although the July 17, 2025, notice stated that Cho was "welcome to apply for internal roles," this was not a genuine or viable opportunity.

103.    At the time, Cho's Slack, directory, and organizational access had been revoked, Anderson remained her manager of record, and Cho was on approved medical leave and medically

unable to work or interview, rendering internal mobility practically impossible.

104. This was done while Cho was employed and on medically protected leave.

105. Cho was prohibited from working, interviewing, or applying for roles while on medical leave, rendering any purported internal mobility illusory.

106. Colleagues messaged Cho, but those communications went unseen due to revoked access, creating the false appearance that Cho was unresponsive or disengaged while she remained employed and on approved medical leave, thereby damaging her professional reputation and relationships she had built over more than three years at AWS.

107. Notably, the July 17, 2025, letter referenced a standard severance framework but did not include any severance agreement, payment terms, or documents for execution. Accordingly, severance discussions have not progressed to a finalized offer or agreement.

108. On July 22, 2025, Cho emailed Mr. Peter Cray ("Mr. Cray"), VP, World Wide Sales Strategy and Operations, informing him that a reorganization placed her under multiple new managers, but her final manager, Anderson, lacked understanding of her role and engaged in conduct that severely impacted her mental health.

109. Cho reported that while on approved medical leave, her role was eliminated following escalating pressure, monitoring, and PTO demands despite HR guidance, cutting off her ability to complete a strategic project entrusted to her by SMGS (Sales, Marketing, and Global Services) Tech leadership. Cho sought protection, fairness, and clarity, emphasizing her sustained VP- and L8-level support, active L7 promotion trajectory, and ongoing commitment to AWS's mission.

110. On July 23, 2025, Cho emailed HR leader, Mr. Adam Forbes ("Mr. Forbes"), L8, HR Director, that while on approved medical leave, her role was eliminated following a

16

reorganization that placed her under multiple new managers, culminating in Anderson, who lacked understanding of her role and whose conduct (including resistance to senior-level engagement, escalating pressure, monitoring, and disregard of DLS guidance) severely impacted her mental health.

111.    Cho emphasized that she had strong VP- and L8-level support, was actively progressing toward L7, and had been entrusted with a strategic SMGS Tech initiative aligned with 2025 priorities.

112.    Further, Cho requested a full review of the circumstances and protection to ensure any future consideration was based on the merits of her contributions rather than biased or incomplete managerial input.

113.    Although senior leadership, including Mr. Cray and Mr. Forbes, was placed on notice of the circumstances described above, no response, investigation, or corrective action followed. No steps were taken to address the ongoing interference with Cho's employment status or internal mobility during her protected medical leave, rendering the purported opportunity for internal reemployment purely procedural rather than meaningful.

114.    On or about August 26, 2025, Cho received a message from Senior Manager Ms. Kristen Downs ("Ms. Downs") (L7), Head of Strategy & Operations, a senior leader with whom Cho had worked closely and who had previously supported Cho's promotion.

115.    In the message, Ms. Downs expressed that she was "sad to hear the news" and referenced Cho's "opportunity to find a better fitting role," reflecting that AWS had internally communicated Cho's departure or separation as a settled outcome.

116.    This communication occurred while Cho remained employed and on approved medical leave, evidencing premature and inconsistent internal treatment of Cho's employment

17

status.

117.    In or around July 28, 2025, Cho's treating physician determined that Cho was not medically cleared to return to work and recommended an extension of her medical leave.

118.    Cho accordingly requested an extension of her legally protected medical leave, which was approved by AWS via DLS and extended through September 25, 2025.

119.    On or about September 9, 2025, Mr. Bell also messaged Cho, conveying his regret for Cho being impacted by the Reduction in Force, that it was a pleasure to work with her, and that she did "incredible work."

120.    While Cho remained employed and on protected medical leave, Cho subsequently received additional messages from colleagues—including on or about October 28, 2025—indicating that they had been informed Cho was part of a layoff. These communications reflect that Defendants had internally communicated Cho's departure prematurely, causing colleagues to treat Cho as already terminated while she remained on medical leave.

121.    On or about September 25, 2025, Cho received an email from Amazon DLS informing that Cho's leave decision had been updated and her leave had been approved through January 6, 2026.

122.    On November 13, 2025, while Cho remained on approved medical leave and was medically unable to work or seek internal roles, AWS issued a second letter reversing the assurances provided on July 17 and asserting that the 90-day adjustment period had already commenced.

123.    The letter set Cho's last day of employment as February 11, 2026, with termination effective February 12, 2026, effectively two business days before Cho's scheduled February 15, 2026, RSU vest—resulting in her separation occurring immediately before a significant equity

18

vesting event. This reversal contradicted prior assurances and accelerated Cho's separation while she remained medically unable to work, immediately preceding a significant equity vest. *See*

124. Notably, at the time the second letter was issued, Cho remained on protected medical leave, her internal systems access had been restricted or removed, she was medically unable to work or pursue internal opportunities, and AWS nonetheless initiated the adjustment period and scheduled her separation immediately before a significant equity vest.

125. At that time, Cho was prohibited from working, applying for roles, or participating in internal hiring processes due to her approved medical leave status.

126. On December 16, 2025, after repeated requests by AWS for documentation from Cho to process her short-term disability pay, Cho received communication approving her FMLA leave from July 3, 2025, through September 24, 2025 and her Short-Term Disability benefits from July 3, 2025, to December 31, 2025.

127. Cho's approved medical leave extended through January 6, 2026.

128. Although Short-Term Disability benefits were later confirmed retroactively, payment was not timely made, and benefits did not cover the period from January 1 through January 6, 2026, leaving Cho without income during that portion of her approved medical leave.

129. During Cho's approved medical leave, AWS repeatedly escalated documentation demands by requiring new and duplicative medical certifications from multiple treating physicians, despite having already received sufficient documentation supporting Cho's medical leave and Short-Term Disability eligibility.

130. These expanding and repetitive requests were imposed while Cho remained medically unable to work, delayed benefit processing, and compounded Cho's stress and medical deterioration during her protected leave.

131. Despite written assurances, AWS failed to pay Cho regular base salary during substantial portions of the notification period AWS asserted had commenced on November 13, 2025.

132. Cho received no payroll checks from November 13, 2025, until January 30, 2026 – a span of approximately 78 days during which AWS represented that the notification period was running.

133. As a result, during the purported 90-day notification period (November 13, 2025, through February 11, 2026), Cho was paid regular base salary for only approximately two weeks, in direct contradiction of AWS's written policy.

134. Additionally, AWS initiated the notification period on November 13, 2025, while Cho remained on approved Short-Term Disability leave through January 6, 2026, contradicting AWS's policy that "Approved STD… will not be impacted" by notification-related actions.

135. Further, had AWS honored the July 17, 2025, representation—and the written policy quoted above—that the notification period would commence after Cho's return from protected leave, Cho's employment would have extended into April 7, 2026.

136. Under that timeline, Cho would have received the February 15, 2026, equity vest, representing approximately $45,887.21 in vested RSUs based on the February tranche alone, with additional vesting scheduled later in the year.

137. This vest would have occurred while Cho remained employed, consistent with AWS's policy ensuring employees receive "any RSU vesting that you are eligible to receive" during the notification period.

138. By reversing this notification timeline on November 13, 2025, and starting the clock during Cho's medical leave, AWS positioned Cho's separation to occur two business days

before the February 15 vest, causing forfeiture of equity that would have been protected under both the original timeline and AWS's written policy.

139.    In or around December 2025, while Cho remained employed and on protected medical leave, AWS initiated its year-end performance review process and invited Cho to participate.

140.    At that time, AWS had already revoked Cho's access to the systems required to complete self-review or provide peer feedback, rendering her unable to submit any input or context. By contrast, Anderson retained full system access and the ability to submit evaluation materials.

141.    As a result, AWS conducted a one-sided performance review process while Cho was unable to participate, respond, or correct the record.

142.    Following Cho's return from approved medical leave on January 7, 2026, AWS failed to reinstate Cho in any functional or meaningful manner.

143.    Despite Cho's timely return and repeated good-faith efforts to confirm her employment status, AWS closed multiple HR tickets without resolution and redirected Cho to Disability and Leave Services ("DLS").

144.    Although DLS represented on January 12, 2026, that it was reviewing the matter and would respond within three business days, no response was provided.

145.    Instead, Cho's access to AtoZ – the sole system available to her to confirm employment status, pay, and leave reconciliation – was revoked.

146.    When Cho contacted AWS IT to rule out a technical issue, IT confirmed that Cho's account remained flagged as on leave, that such designation restricted AtoZ access, and that AtoZ access was controlled exclusively by HR.

147. As a result, Cho was unable to confirm her reinstatement status, reconcile wages, or correct system records, while AWS continued to treat Cho as on leave despite her return.

148. This conduct materially interfered with Cho's post-leave reinstatement and access to employment benefits.

149. Specifically, on January 7, 2026, the day Cho returned from approved medical leave, Cho opened an HR ticket requesting confirmation of her employment status, reconciliation of unpaid wages, and clarification of the notification-period timeline.

150. HR closed the ticket without addressing these issues and instructed Cho to contact Disability and Leave Services ("DLS").

151. When Cho reopened the ticket, clarifying that her request concerned post-leave payroll accuracy and employment status, not leave administration, HR again closed the ticket without resolution, stating only that Cho remained marked as "on leave" and directing her to DLS.

152. On January 8, 2026, Cho contacted DLS as instructed. On January 12, 2026, DLS responded that it was "looking into the matter" and would provide a response within three business days.

153. No response was provided within that timeframe or thereafter..

154. In the days following her return, Cho lost access to AtoZ, the only remaining internal system available to her to confirm employment status, pay, leave reconciliation, or eligibility to apply for internal job opportunities.

155. Cho contacted AWS IT to determine whether the loss of access was a technical issue.

156. On January 15, 2026, AWS IT confirmed that Cho's account remained flagged as "LOA" despite her January 7 return, and that AtoZ access and leave designation were controlled

by HR, not IT.

157.    On January 20, 2026, Cho again contacted DLS, marking her fifth outreach to HR and DLS since her January 7 return, noting that the promised response deadline had passed and that she remained unable to confirm her employment status or pay. No response was provided.

158.    As a result of Defendants' continued silence and failure to correct the improperly initiated notification clock, Cho's employment ended on February 11, 2026, with termination effective February 12, 2026, when the improperly initiated notification period expired.

159.    Although AtoZ access was restored at some point in late January 2026, Cho received no communication explaining when, why, or by whom access was restored.

160.    As of early February 2026—nearly four weeks after Cho's return from approved medical leave—AWS had not addressed Cho's requests to reconcile her employment status, pay, or the February 11, 2026, separation timeline, leaving Cho without meaningful reinstatement or notice-period runway.

161.    This administrative lockout left Cho unable to pursue internal opportunities or verify her compensation during the purported notification period.

162.    Compounding this obstruction, AWS designated February 11, 2026, as Cho's last day of work, with termination effective February 12, 2026 – just two business days before Cho's equity was scheduled to vest on February 15, 2026.

163.    This separation timeline was imposed while Cho was emerging from approved medical leave and while AWS continued to misclassify Cho as on leave, restrict system access, and fail to reinstate her in a functional or meaningful manner.

164.    By structuring Cho's separation to take effect immediately before a known vesting date – after accelerating internal timelines and depriving Cho of a meaningful opportunity to

23

reinstate, pursue internal placement, or correct administrative errors – AWS positioned Cho to forfeit earned equity benefits.

165. The proximity of Cho's termination to the vesting date, viewed in the context of Defendant's post-leave conduct, supports an inference of interference with Cho's employment benefits.

166. In addition, one week prior to Cho's termination on February 12, 2026, Shannon Thompson ("Ms. Thompson"), Director, ASP Strategy & Operations, circulated a team-wide announcement introducing two new senior hires into her organization of Dan Kesselring, Senior Manager, Strategy & Operations, and Adrion Hernandez, Principal, Sales Operations, contradicting any purported economic basis for a Reduction in Force.

167. As a result of Defendants' conduct, Cho suffered severe and lasting harm across multiple facets of her life.

168. While on approved and protected medical leave for Graves' disease with thyroid eye disease, severe anxiety, and related physical deterioration, Cho was subjected to termination-related communications that significantly disrupted her recovery and exacerbated her condition.

169. Cho experienced heightened anxiety, panic symptoms, depression, sleep disturbance, physical decline, and worsening thyroid-related symptoms, all documented by treating physicians and directly linked to employment-related stress.

170. Emotionally, Cho's confidence, sense of safety, and professional identity were profoundly damaged, resulting in persistent fear, sadness, humiliation, and loss of trust. Socially, Cho withdrew, became isolated, and experienced strain in personal relationships due to emotional exhaustion and distress.

24

171.    Financially, Cho faced uncertainty from loss of income security, threatened equity vesting, medical expenses, and disruption of a previously stable and upward career trajectory.

172.    Collectively, these harms deprived Cho of psychological stability, physical well-being, professional standing, and quality of life, delaying recovery and causing ongoing consequential damages.

173.    These harms were documented by treating physicians and were directly exacerbated by Defendants' actions during Cho's protected medical leave.

174.    As a result of Anderson's conduct and the escalating hostile work environment, Cho was forced to seek accommodation, report Anderson's conduct to Disability and Leave Services, request federally protected medical leave, and notify senior leadership of the circumstances surrounding her termination while on protected leave.

175.    As described herein, immediately after Cho engaged in protected activity—and because of that activity—Defendants discriminated against and retaliated against Cho on the basis of her disability and need for legally protected medical leave.

176.    Defendants subjected Cho to adverse and hostile treatment, including intensified scrutiny and monitoring; dismissive and minimizing responses to her documented medical condition; failure to engage in the interactive process or provide reasonable accommodation; rejection of her request to work remotely for medical treatment; obstruction of her access to senior leadership and interference with advancement opportunities; reversal of prior written promotion-related assurances; reprimands issued in violation of written directives from Amazon Disability Leave Services; termination of her role while she was on protected medical leave; revocation of organizational access while purporting to invite internal applications; failure to respond to Cho's escalation emails seeking fair treatment; premature internal communications regarding her

departure while she remained employed; issuance of conflicting notices regarding her employment status and separation date; and manipulation of the timing of her termination to occur immediately before a significant equity vesting event.

177.   Defendants' conduct escalated after Cho engaged in protected activity and would deter a reasonable employee from asserting similar rights.

178.   As detailed hereinabove, Defendants retaliated against Cho immediately after she engaged in protected activities, including through interference with medical leave, heightened scrutiny, obstruction of advancement, termination during protected leave, and manipulation of her separation timing to precede a scheduled RSU vest.

179.   As a result of Defendants' action, Cho has suffered economic losses including unpaid salary, delayed disability benefits, threatened equity compensation, and loss of future earning capacity.

180.   As a result of Defendants' actions, Cho has suffered profound feelings of depression, anxiety, loss of self-esteem, demoralization, loss of confidence, difficulty sleeping, recurring nightmares, and consistent struggles with her mental health and anxiety.

181.   As a result of the acts and conduct complained of herein, Cho has suffered and will continue to suffer the emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Cho further experienced severe emotional and physical distress.

**FIRST CAUSE OF ACTION**
**(For Interference Under the FMLA)**
*Against All Defendants*

182.   Cho repeats and realleges each and every allegation of the preceding paragraphs as if fully set forth here.

183. The Family and Medical Leave Act of 1993, as amended, 29 U.S.C. § 2601 et seq. ("FMLA"), entitles eligible employees to take protected medical leave for a serious health condition and prohibits employers from interfering with, restraining, or retaliating against employees for exercising those rights.

184. The FMLA further requires that, upon return from protected leave, an employee be restored to the same or an equivalent position with equivalent pay, benefits, and terms and conditions of employment, and prohibits the loss of accrued employment benefits by reason of taking protected leave.

185. As described herein, Defendants interfered with, restrained, and denied Cho's rights under the FMLA by discouraging and obstructing her use of protected medical leave; subjecting her to heightened scrutiny and monitoring after her leave request; pressuring her to work while leave was pending and after approval; and treating Cho's role as eliminated while she remained on approved medical leave. These actions included, inter alia, escalating surveillance following Cho's leave request; issuing reprimands in violation of directives from Amazon Disability Leave Services; terminating Cho while she remained on protected leave; revoking her organizational access while purporting to invite internal applications; internally communicating her departure while she was still employed; issuing conflicting notices regarding her employment status and separation date; and manipulating the timing of her termination to occur just days before a scheduled RSU vesting event, depriving Cho of significant earned equity.

186. As a result of Defendants' unlawful interfering conduct in violation of the FMLA, Cho has suffered and continues to suffer economic loss, for which she is entitled to an award of monetary damages and other relief.

187.   As a result of the unlawful interfering conduct of Defendants in violation of FMLA, Cho has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Cho is entitled to an award of monetary damages and other relief.

188.   The unlawful interfering actions of Defendants constitute malicious, willful, and wanton violations of FMLA, for which Cho is entitled to the maximum allowable relief under FMLA, including lost compensation and benefits, interest, and liquidated damages, together with such other relief as the Court deems just and proper.

**SECOND CAUSE OF ACTION**
**(For Retaliation Under the FMLA)**
*Against All Defendants*

189.   Cho repeats and realleges each and every allegation of the preceding paragraphs as if fully set forth here.

190.   Section 2612(a)(1)(D) of the FMLA, states in pertinent part: "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee."

191.   Section 2615(a) of the Family and Medical Leave Act states in pertinent part:

Interference with rights. (1) Exercise of rights. It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of, or the attempt to exercise, any right provided under this subchapter. (2) Discrimination. It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

192.   Defendants violated these sections as set forth herein.

193. Cho engaged in protected activities, including but not limited to, requesting remote work from Korea for a brief period for her medical treatment, escalating Anderson's harassment to DLS, requesting a legally protected leave of absence, and emailing senior leadership informing them of her unfair termination.

194. After Cho disclosed her disability and medical limitations, Defendants subjected Cho to adverse and hostile treatment, including obstructing her access to senior leadership and materially interfering with the advancement, visibility, and trajectory of her executive-sponsored initiatives.

195. After Cho engaged in protected FMLA activity, Defendants escalated this conduct and retaliated against Cho by intensifying scrutiny and monitoring; pressuring her to work during approved medical leave; isolating her from internal systems; issuing reprimands in violation of written directives from Amazon Disability Leave Services; eliminating Cho's role while she remained on protected medical leave; purporting to invite Cho to apply for internal roles while revoking organizational access and rendering such opportunities illusory; internally communicating Cho's departure while she remained employed; issuing conflicting communications regarding her termination date; and timing Cho's separation to occur just days before a scheduled RSU vest, thereby causing material economic harm. Defendants' actions would deter a reasonable employee from exercising rights protected under the FMLA.

196. Defendants would not have taken the retaliatory actions described herein but for Cho's exercise of her rights under the FMLA, including requesting and taking legally protected medical leave and opposing Defendants' interference with those rights.

197. Such retaliatory treatment would dissuade any reasonable employee from making or supporting a similar request for reasonable accommodations and/or a legally protected leave.

198.    As a result of the acts and conduct complained of herein, Cho suffered and continues to suffer stress, ongoing humiliation, intimidation, ridicule, fear, anxiety, adverse employment action, loss of income, the loss of a salary, special damages, loss of employment, loss of benefits, and loss of other compensation which such employment entails, and Cho has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

199.    Defendants' conduct was willful and undertaken with knowledge of Cho's rights under the FMLA.

200.    Cho is entitled to the maximum damages allowable under this law.

**THIRD CAUSE OF ACTION**
**(For Disability Discrimination Under the NYSHRL)**
*Against All Defendants*

201.    Cho repeats and realleges each and every allegation of the preceding paragraphs as if fully set forth here.

202.    New York State Executive Law §296(1)(a) provides that:

It shall be an unlawful discriminatory practice: For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

203.    As described herein, Defendants engaged in unlawful employment practices prohibited by the NYSHRL by discriminating against Cho on the basis of her disability, including by subjecting her to disparate treatment and a hostile work environment.

204.    As described herein, Defendants discriminated against Cho on the basis of her disability and need for legally protected leave of absence, as evidenced by Defendants creating,

30

condoning, and failing to correct a hostile and adverse work environment; treating Cho with hostility and animosity; learning of Cho's diagnosis and failing to provide reasonable accommodation and meaningful dialogue regarding Cho's disability; by Defendant Anderson being dismissive of Cho's health condition and minimizing it during a 1:1 meeting; rejecting Cho's request to work remotely from Korea for medical treatment; blocking Cho's access to senior leadership and materially interfering with the advancement, visibility, and trajectory of her initiative and role; intensifying his scrutiny and monitoring of Cho after finding out that Cho had requested a legally protected leave of absence; reversing previous written assurances by senior leaders regarding L7 promotion and telling  Cho that her role may never be in scope for L7; reprimanding Cho via  emails and Slack messages in violation of the written directive of Amazon DLS that Cho should not attend meetings; by Defendant AWS abruptly terminating Cho while Cho was on legally protected leave; noting that Cho was "welcome to apply for internal roles" but revoking organizational access making the offer illusory and performative; not responding to Cho's emails sent to leadership asking for fair treatment; internally communicating Cho's departure even though Cho was still employed; sending conflicting emails regarding Cho's last date at work; and changing Cho's last date at work as an afterthought so that she may be discharged just days before the vesting of her RSU.

205.    As a result of Defendants' action, Cho has suffered economic losses including unpaid salary, delayed disability benefits, threatened equity compensation, and loss of future earning capacity.

206.    As a result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Cho has suffered and continues to suffer mental and physical pain, for which she is entitled to an award of monetary damages and other relief.

207.    As a result of the unlawful discriminatory conduct of Defendants in violation of NYSHRL, Cho has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Cho is entitled to an award of monetary damages and other relief.

208.    The unlawful discriminatory actions of Defendants were willful and undertaken with reckless disregard for Cho's rights under the NYSHRL, entitling Cho to all available relief, including compensatory and punitive damages.

### FOURTH CAUSE OF ACTION
#### (For Retaliation Under the NYSHRL)
*Against All Defendants*

209.    Cho repeats and realleges each and every allegation of the preceding paragraphs as if fully set forth here.

210.    Executive Law § 296 provides that:

> "[i]t shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has filed a complaint, testified, or assisted in any proceeding under this article."

211.    Cho engaged in protected activities, including but not limited to, requesting remote work from Korea for a brief period for her medical treatment, escalating Defendant Anderson's harassment to DLS, requesting a legally protected leave of absence, and emailing senior leadership informing them of her unfair termination.

212.    As described herein, immediately after Cho engaged in protected activities, Defendants retaliated against Cho as evidenced by Defendants creating, condoning, and failing to correct a hostile and adverse work environment; treating Cho with hostility and animosity; learning of Cho's diagnosis and failing to engage in the interactive process to assist Cho with any helpful

32

accommodations; including Defendant Anderson being dismissive of Cho's health condition and minimizing it during a 1:1 meeting; rejecting Cho's request to work remotely from Korea for medical treatment; blocking Cho's access to senior leadership and materially interfering with the advancement, visibility, and trajectory of her initiative and role; intensifying his scrutiny and monitoring of Cho after finding out that Cho had requested a legally protected leave of absence; reversing previous written assurances by senior leaders regarding L7 promotion and telling Cho that her role may never be in scope for L7; reprimanding Cho via emails and Slack messages in violation of the written directive of Amazon DLS that Cho should not attend meetings; by Defendant AWS abruptly terminating Cho while Cho was on legally protected leave; noting that Cho was "welcome to apply for internal roles" but revoking organizational access making the offer illusory and performative; not responding to Cho's emails sent to leadership asking for fair treatment; internally communicating Cho's departure even though Cho was still employed; sending conflicting emails regarding Cho's last date at work; and changing Cho's last date at work as an afterthought so that she may be discharged just days before the vesting of her RSU.

213.    Defendants would not have retaliated against Cho but for Cho's engagement in protected activities, including requesting reasonable accommodation, seeking legally protected medical leave, and opposing unlawful interference with those rights.

214.    As a result of Defendants' action, Cho has suffered economic losses including unpaid salary, delayed disability benefits, threatened equity compensation, and loss of future earning capacity.

215.    As a result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Cho has suffered and continues to suffer mental and physical pain, for which she is entitled to an award of monetary damages and other relief.

216.    As a result of the unlawful discriminatory conduct of Defendants in violation of NYSHRL, Cho has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Cho is entitled to an award of monetary damages and other relief.

217.    The unlawful retaliatory actions of Defendants were willful and undertaken with reckless disregard for Cho's rights under the NYSHRL, entitling Cho to all available relief, including compensatory and punitive damages.

## FIFTH CAUSE OF ACTION
### (For Disability Discrimination Under the NYCHRL)
### Against All Defendants

218.    Cho repeats and realleges each and every allegation of the preceding paragraphs as if fully set forth here.

219.    New York City Administrative Code §8-107(1) provides that it shall be an unlawful discriminatory practice:

> For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions, or privileges of employment.

220.    As described herein, Defendants engaged in unlawful employment practices prohibited by NYCHRL, by discriminating against Cho on the basis of Cho's disability by creating, fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment that included, among other things, discriminatory and disparate treatment of Cho.

221.    As described herein, Defendants discriminated against Cho on the basis of her disability and need for legally protected leave of absence, as evidenced by Defendants creating, condoning, and failing to correct a hostile and adverse work environment; treating Cho with hostility and animosity; learning of Cho's diagnosis and failing to engage in the interactive process to assist Cho with any helpful accommodations; by Defendant Anderson being dismissive of Cho's health condition and minimizing it during a 1:1 meeting; rejecting Cho's request to work remotely from Korea for medical treatment; blocking Cho's access to senior leadership and materially interfering with the advancement, visibility, and trajectory of her initiative and role; intensifying his scrutiny and monitoring of Cho after finding out that Cho had requested a legally protected leave of absence; reversing previous written assurances by senior leaders regarding L7 promotion and telling  Cho that her role may never be in scope for L7; reprimanding Cho via  emails and Slack messages in violation of the written directive of Amazon DLS that Cho should not attend meetings; by Defendant AWS abruptly terminating Cho while Cho was on legally protected leave; noting that Cho was "welcome to apply for internal roles" but revoking organizational access making the offer illusory and performative; not responding to Cho's emails sent to leadership asking for fair treatment; internally communicating Cho's departure even though Cho was still employed; sending conflicting emails regarding Cho's last date at work; and changing Cho's last date at work as an afterthought so that she may be discharged just days before the vesting of her RSU.

222.    As a result of Defendants' action, Cho has suffered economic losses including unpaid salary, delayed disability benefits, threatened equity compensation, and loss of future earning capacity.

223.    As a result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Cho has suffered and continues to suffer mental and physical pain, for which she is entitled to an award of monetary damages and other relief.

224.    As a result of the unlawful discriminatory conduct of Defendants in violation of NYCHRL, Cho has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Cho is entitled to an award of monetary damages and other relief.

225.    The unlawful discriminatory actions of Defendants constitute malicious, willful, and wanton violations of NYCHRL, for which Cho is entitled to the maximum allowable damages under this statute and an award of punitive damages.

## SIXTH CAUSE OF ACTION
### (For Retaliation Under the NYCHRL)
### *Against All Defendants*

226.    Cho repeats and realleges each and every allegation of the preceding paragraphs as if fully set forth here.

227.    The New York City Administrative Code §8-107(7) provides that it shall be unlawful discriminatory practice: "For an employer . . . to discriminate against any person because such person has opposed any practices forbidden under this chapter…"

228.    Cho engaged in protected activities, including but not limited to, requesting remote work from Korea for a brief period for her medical treatment, escalating Defendant Anderson's harassment to DLS, requesting a legally protected leave of absence, and emailing senior leadership informing them of her unfair termination.

229.    As described herein, immediately after Cho engaged in protected activities, Defendants retaliated against Cho as evidenced by Defendants creating, condoning, and failing to correct a hostile and adverse work environment; treating Cho with hostility and animosity; learning of Cho's diagnosis and failing to engage in the interactive process to assist Cho with any helpful accommodations; by Defendant Anderson being dismissive of Cho's health condition and minimizing it during a 1:1 meeting; rejecting Cho's request to work remotely from Korea for medical treatment; blocking Cho's access to senior leadership and materially interfering with the advancement, visibility, and trajectory of her initiative and role; intensifying his scrutiny and monitoring of Cho after finding out that Cho had requested a legally protected leave of absence; reversing previous written assurances by senior leaders regarding L7 promotion and telling Cho that her role may never be in scope for L7; reprimanding Cho via emails and Slack messages in violation of the written directive of Amazon DLS that Cho should not attend meetings; by Defendant AWS abruptly terminating Cho while Cho was on legally protected leave; noting that Cho was "welcome to apply for internal roles" but revoking organizational access making the offer illusory and performative; not responding to Cho's emails sent to leadership asking for fair treatment; internally communicating Cho's departure even though Cho was still employed; sending conflicting emails regarding Cho's last date at work; and changing Cho's last date at work as an afterthought so that she may be discharged just days before the vesting of her RSU.

230.    Defendants would not have retaliated against Cho but for Cho's protected activity, including requesting reasonable accommodation, seeking legally protected medical leave, and opposing Defendants' interference with those rights.

231.    As a result of Defendants' action, Cho has suffered economic losses including unpaid salary, delayed disability benefits, threatened equity compensation, and loss of future

earning capacity.

232.   As a result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Cho has suffered and continues to suffer mental and physical pain, for which she is entitled to an award of monetary damages and other relief.

233.   As a result of the unlawful discriminatory conduct of Defendants in violation of NYCHRL, Cho has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Cho is entitled to an award of monetary damages and other relief.

234.   The unlawful discriminatory actions of Defendants constitute malicious, willful, and wanton violations of NYCHRL, for which Cho is entitled to the maximum allowable damages under this statute and an award of punitive damages.

### SEVENTH CAUSE OF ACTION
**(Aiding and Abetting in Violation of the NYSHRL and NYCHRL)**
***Against Defendant Anderson***

235.   Cho repeats and re-alleges each allegation of the preceding paragraphs as if fully set forth here.

236.   Anderson aided, abetted, incited, compelled, or coerced AWS's unlawful conduct, including discrimination, hostile treatment, adverse actions, failing to provide a reasonable accommodation and engage in an interactive process, retaliation, and termination against Cho by actually participating in the conduct giving rise to the claims herein.

237.   Anderson was aware of his role in the unlawful activity and knowingly assisted AWS in its violations of the NYSHRL and NYCHRL.

238.    As a direct and proximate result of Anderson's conduct, Cho has suffered and continues to suffer damages, including lost earnings, lost benefits, other financial loss, and emotional distress.

239.    Anderson's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Cho, entitling her to punitive damages.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants:

A. Declaring that Defendants engaged in unlawful employment practices prohibited by the FMLA, NYSHRL, and NYCHRL by discriminating and retaliating against Plaintiff on the basis of her disability, and by creating and maintaining a hostile work environment;

B. Declaring that Plaintiff has been damaged in an amount to be determined at trial;

C. Awarding Plaintiff compensatory damages for mental, emotional injury, distress, pain and suffering, and injury to her reputation in an amount to be proven;

D. Awarding Plaintiff punitive damages;

E. Awarding Plaintiff attorneys' fees, costs, disbursements, and expenses incurred in the prosecution of the action; and

F. Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and proper to remedy Defendants' unlawful employment practices.

Dated: May 21, 2026
     New York, New York

                                   **RISSMILLER PLLC**

By:    */s/ Matthew Madzelan*
        Matthew Madzelan
        Alex Rissmiller
        5 Pennsylvania Plaza, 19th Floor
        New York, NY 10001
        T: (646) 664-1412
        arissmiller@rissmiller.com
        mmadzelan@rissmiller.com

        *Attorneys for Plaintiff Evelyn Cho*